IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 07-cr-00497-JLK

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RALPH RAUSCH,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER ON SENTENCING

---

Kane, J.

## I.

### Introduction

The defendant Ralph Rausch (Rausch) has plead guilty to a one count Information charging a violation of 18 U.S.C. § 2252A(a)(5)(B), Possession of Child Pornography. The statutory penalty is not more than ten years imprisonment; not more than $250,000 fine, or both such imprisonment and fine; not less than five years and not more than life supervised release and a mandatory $100 special assessment fee. The date of the offense was August 30, 2007 and the plea was entered and accepted on January 31, 2008. On December 13, 2007, Rausch was released from custody on bond. He has been in full compliance with its terms and conditions. Rausch appears now before me for sentencing.

## II.

## Advisory Sentencing Guidelines

Pursuant to *Gall v. United States*, 128 S. Ct. 586 (2007), I begin my sentencing analysis with a review of the advisory sentencing guidelines. *See id.* at 596. The United States Probation Office has calculated the total offense level for Rausch under the guidelines at 30. *See* Presentence Investigation Report at 9-10. With a criminal history category of 1, this total offense level yields an advisory guideline range for imprisonment of 97 to 121 months. Pursuant to Section 5G1.1(a), the range for a sentence is 97 to 120 months, the maximum allowable by statute. Because the applicable guideline range is higher than Zone B of the Sentencing Table, Rausch is not eligible for probation under the sentencing guidelines. United States Sentencing Commission Guidelines Manual § 5B1.1(a)(2)(2007). The Probation Office reports that the sentencing guidelines set a fine range of $17,000 to $175,000 and a supervised release range of five years to life.

The facts bearing upon this sentence are uncontested. The Government asserted in its Response and Objection to the Presentence Investigation Report, however, that there is an evidentiary and legal basis to increase Rausch's base offense level by five rather than two pursuant to Section 2G2.2(b)(3)(F), with which the Probation Department, Rausch's counsel and I disagree, and for an upward departure pursuant to Section 5K2.0(a)(1)(B) as a result of the unusually large size of Rausch's child pornography cache. The Government does not seek to increase Rausch's total offense level on either basis, however, and ultimately concurs that the

guideline sentence applicable to his offense level is 97 to 120 months as calculated by the Probation Office.  *See* Government's Sentencing Memorandum (Doc. #21) at 1 & n.1.[1]

"[T]he Guidelines give a district court a measure of national practice to use as a starting point ..."  *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2007).  The Government asserts that because the Sentencing Guidelines were constructed at the direction of Congress, they should receive great  weight.  Ordinarily this is so, but not when Congress ignores the recommendations and studies of the Sentencing Commission as it did with this crime, and thereby negates the rationale for affording such weight to them.  Section 2G2.2 presents just such an instance.  As the Supreme Court said in *Gall v. United States*, 128 S. Ct. at 594, some sections of the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions . . . . [but at FN 2 on 594]  not all of the Guidelines are tied to this empirical evidence."

As Chief Judge  Bataillon of the District of Nebraska observed:

> [F]or policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as . . . child crimes and sexual offenses.  Consequently, the Guideline ranges of imprisonment for those crimes are a less reliable appraisal of a fair sentence.  In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role — basing its determinations on "'empirical data and national experience, guided by a professional staff with appropriate expertise'"— it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in Section 3553(a).

---

[1]	In addition, I note that an increase in the total offense level by three or even two levels would only narrow the applicable guideline sentence to the 120 months statutory maximum.

*United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. Lexis 45302 (D. Neb. May 30, 2008), cited in Defendant's Reply Brief at 7.

Having found the correct calculation of the Guidelines sentence to be 97 to 120 months and a fine range of $17,000 to $ 175,000, and as directed by the Tenth Circuit's recent pronouncements in *United States v. Huckins*, No. 07-3220, 2008 WL 2514460 (10th Cir. June 25, 2008), and *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008), I make the following findings: (1) the Guidelines are not mandatory; (2) the facts have been provided by the Probation Office and subjected to objection by both the prosecution and the defense, but no objections have been made; (3) both parties have been advised that the sentence to be imposed will not be a Guideline sentence; and (4) both have been given full opportunity to brief and argue their positions as to a condign sentence even though the Supreme Court has recently made such notice unnecessary in *Irizarry v. United States*, No. 06-7517, 2008 WL 2369164 (June 12, 2008). Moreover, Rausch has been afforded a full opportunity to exercise his right of allocution.

I further find, as stated in *United States v. Bennett, supra*, that the application of the Guidelines does "not exemplify the Commission's exercise of its characteristic institutional role" and that it produces a sentence greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a). Accordingly, I will now consider the prescribed sentencing factors in Section 3553(a) and explain the sentence imposed in accordance with the above cited cases.[2]

---

[2] Never before have I had submitted to me for sentencing purposes as much information and argument as presented in this case. The report of the Probation Office, the appendices thereto, the documents, affidavits, motions, briefs with attachments and arguments of counsel and the court records are voluminous. I have studied every page and read numerous cases and other authorities cited by counsel and located by my own research. I will address each factor set forth in Section 3553 and present the reasons for the sentence imposed in that order.

III.

The Nature and Circumstances of the Offense

The Plea Agreement provides the following facts, nearly all of which are not in dispute:

> In July, 2006, an investigation in Europe led to the discovery of an internet-based bulletin board group called "Funny World." The board was a trading platform designed explicitly to facilitate the exchange of child pornography. With each posting, users could post comments about the particular pornographic image. The platform was hosted by a French-owned server located in France. At all times relevant to the Information, the defendant lived in the District of Colorado. "Funny World" was shut down by its administrator in late July or August, 2006. However, law enforcement was able to collect screen captures of the internet provider (IP) addresses belonging to some of the bulletin board's users. One of these IP addresses was tracked to the defendant, Ralph Rausch. Rausch had used the screen name 'Carmine 5,' when accessing the "Funny World" bulletin board. Between June 6, 2006 and September 3, 2006, Rausch posted to the bulletin board 112 times. The Government submits that these postings are what allowed him to download other images posted by other individuals using this bulletin board. Rausch does not agree that the bulletin board required that he first post images in order to download images posted by others.

The Probation Office's Presentence Investigation report confirms Rausch's assertion that the bulletin board did not require that he first post images in order to download those posted by others. I do not regard the question of who posted first to be an aggravating or mitigating circumstance. Either person is equally culpable.

Rausch's home was searched and his computer seized along with a three-ring binder containing child pornography. The property seized contained several thousand images and videos depicting child pornography and child erotica. It would serve no useful purpose to describe the images charged in the Information or in the massive data taken during the search. Suffice to say it is hard core child pornography. It is also important to note Rausch admitted

during the execution of the search warrant that he possessed the pornography, knew it was illegal to do so and knew the pornographic images had been transported in interstate and foreign commerce by computer.  The Government's evidence revealed Rausch made at least 112 postings of multiple photos of children in various sexually explicit positions and that he expressed sexual excitement while commenting in many of the postings.  Moreover, he made numerous requests on the "Funny World"  website for child pornography material.

In an interview at the time his home was searched, Rausch said to law enforcement officers, "I know better.  I didn't think I would get caught.  I didn't think storing it to a disk would be illegal.  I don't consider myself a pedophile."  Rausch further stated  he began looking at child pornography in 2000 as a hobby.  He said he would trade images with individuals in bulletin board sites and would share or post up to 100 pictures a night with different people on these sites.  He further stated  he often posted multiple photos of children in various sexually explicit positions and commented on those photos.  The postings often drew return comments from other users.  As previously stated and given Rausch's admissions, I find it unnecessary to describe with particularity the images he possessed and transported in interstate and foreign commerce.

Rausch may not consider himself to be a pedophile, but by any reasonable definition of the term he is.  There is no evidence presented or suggested, however, that he has ever engaged in sexually explicit physical contact with children or in this trafficking for financial gain or profit.

History and Characteristics of the Defendant

Rausch is 49 years old and was born into an intact family.  His parents later divorced.  He has three siblings. He dropped out of school in the 12th grade and soon took and passed a G.E.D. exam.  He enlisted in the United States Air Force on July 12, 1978, at age 18, and served until September 28, 1992  when he was honorably discharged at the rank of Master Sergeant.  While in the Air Force, he was stationed for a time in Europe where he became a consumer of adult heterosexual pornography.  He returned to Denver and has lived here ever since.  He has been married and divorced twice and is presently single and lives alone.  He has two sons by his first wife and one by his second.

Rausch was employed by the Federal Bureau of Prisons from May 30, 1993 until September 7, 2007 when he resigned for personal reasons, including poor health.  He has been unemployed since that time.  He has twice been discharged in bankruptcy, and has a negative net worth.  He receives income from disability benefits supplemented by monthly gifts from his father.  Due to severe physical disabilities and his precarious health status described below, he is unemployable and without other financial resources.  The numerous victims of his offense incurred no pecuniary loss and restitution is not indicated.  Rausch is represented by the Federal Public Defender and is unable to pay a fine.

Physical Health:

Rausch's health is extremely poor.  He has a long history of hypertension, which, according to his attending medical specialist, resulted in the development of end-stage renal failure and diagnosis of  hypertensive nephrosclerosis.  He has been on kidney dialysis since

April 2003, when he was also found to have an aortic abdominal aneurysm requiring open surgical repair.  The following month he returned to the hospital because of anginal symptomology.  Examination disclosed multiple vessel coronary artery disease and he underwent a three-vessel coronary arterial bypass.  Following both surgeries, he developed decubitus ulcers necessitating long-term care with a wound VAC.  The ulcers eventually healed.

Rausch remains on kidney dialysis three times per week for five hours per treatment.  With this regimen, he is maintained in a non-uremic state.  He takes multiple medications, experiences severely painful neuropathy in his lower extremities and suffers from secondary hyperparathyroidism.  He has a family history of diabetes.

Of critical importance, Rausch has been evaluated and accepted for a kidney transplant at the University of Colorado Medical Center Transplant Unit.  He has been on the transplant list for approximately six months.  The transplant team anticipates his wait will be between three and five years for a transplant.

Rausch's sentencing was originally scheduled for May 1, 2008 and was continued first to May 28 because I had not finished reading all of the briefs and attachments, and then to July 10.  On July 7, however, Rausch filed an unopposed motion to continue sentencing because on June 30, 2008 he was rushed to a hospital and diagnosed  with an ischemic right colon.  Surgery was performed and a portion of his colon was removed.  He is fitted with a colostomy bag, home-bound and suffering from considerable pain which is being treated with prescribed narcotics.  Barring complications from renal failure or his coronary artery disease, additional surgery to reconnect his colon will take place in the next few months.

In sum, Rausch is in extremely poor health; under severe dietary restrictions; in need of an organ transplant; probably uremic consequent to his kidney disease; undergoing regular and frequent dialysis and suffering peripheral neuropathy, chronic fatigue and severe effects from the colostomy including more medication, extreme pain and monitoring of the colostomy bag.

<u>Mental and Psychological Assessment:</u>

Pursuant to my order, Rausch was examined by a psychiatrist, Scott A. Humphreys, M.D. who was selected by the Probation Office. After reviewing Rausch's medical history, including neuropathy in his hands and feet as a side effect of dialysis, and the presence of uncontrolled hypertension and impotence, Dr. Humphreys observed that Rausch suffers from occasional depressed moods related to his physical condition and treatment, to the current charge against him and the bond restrictions imposed on him, but not a "full syndrome of major depression that would require antidepressant medication treatment." (Humphreys' March 6, 2008 letter report to the Probation Office.) In his mental status examination, Dr. Humphreys said, "I was quite impressed with Mr. Rausch's attempts to be open and honest and answer my questions thoughtfully and thoroughly. At no time did I feel that he was being manipulative or evasive." (March 6 letter report.)

Rausch demonstrated concrete reasoning and an inability to understand proverbs on an abstract level. Dr. Humpreys' impression is that Rausch has some cognitive defects likely related to brain injury from his hypertension or dialysis treatment. Dr. Humpreys' diagnoses are: "AXIS I: Sexual Disorder, Not Otherwise Specified. Pedophilia. AXIS II: Narcissistic Traits. AXIS III: Multiple as described in Mr. Rausch's medical history. Erectile Dysfunction."

Rausch demonstrates a lack of insight into his sexual behavior relating to the instant offense. Dr. Humphreys states, "This coupled with the fact that he has not had a relationship in the past 13 years makes me very concerned about his maladaptive sexual behaviors. He was unable to convey to me that he appreciated the severity of his offenses." Dr. Humphreys recommends that Rausch be involved in an intensive sex offender treatment program to address specifically his maladaptive sexual behaviors, inability to empathize with his victims, and lack of structure in his daily routine.

Dr. Humpreys opines that Rausch does not have any psychiatric illness such as depression, bipolar disorder, or psychotic disorder. He does not recommend psychiatric medication. He does, however, express concern about Rausch's cognitive difficulties, but is unable to predict whether they will progress. He recommended neuropsychological testing to delineate the extent of the cognitive impairment. In providing sex offender management, Dr. Humphreys states as follows:

> I understand that prison is prescribed by the mandatory guidelines. There are several circumstances that should be seriously considered when evaluating Mr. Rausch's appropriateness for incarceration. 1) Mr. Rausch is on the kidney transplant list. If he goes to prison, he will be removed from this list. Theoretically, he could have his renal failure treated with ongoing dialysis in prison. But, dialysis comes with major risks and side effects. Mr. Rausch's removal from the transplant list could be indirectly fatal. 2) Mr. Rausch is developing cognitive impairments (likely dementia). The inability to reason and remember clearly certainly puts him at high risk of being victimized in the prison population. 3) His medical illnesses also make him weak. This places him at further risk of being victimized.[3]

---

[3] The guidelines are no longer mandatory as Dr. Humphreys relates, nor is it entirely clear that Rausch would be removed from the transplant list. He may stay on the list with the same priority, but if sentenced to prison, actions by the Bureau of Prisons would make that priority problematic. I will comment on this in detail *infra*.

Completing the mental evaluation, on April 10 and 15, 2008, Rausch was examined by Jane M. Wells, J.D., Ph.D., and licensed psychologist. The cognitive deficits noted by Dr. Humphreys were confirmed with particular reference to attention difficulties and concrete reasoning. In her report of May 2, 2008, Dr. Wells states :

> Based on the results of this cognitive assessment and the clinical interview I conducted with Mr. Rausch, I do not disagree with Dr. Humphreys about this man's narcissistic personality characteristics or level of defensiveness. I would add that Mr. Rausch's understanding of his offense may also stem from his memory limitations and concrete thinking; he may fail to appreciate, in general, the amount of the computer images he cultivated or the implications of the fact that he maintained pornographic photographs on his computer.

> In terms of how Mr. Rausch's cognitive limitations might affect his adaptation to prison, I concur with Dr. Humphreys that his "inability to reason and remember clearly certainly puts him at high risk of being victimized in the prison population." . . . Consequently, Mr. Rausch may be easily taken advantage of by others, especially given his physical limitations and medical disabilities as noted by Dr. Humphreys.

The Availability of an Organ Transplant:

There is no dispute that Rausch is in dire need of a kidney transplant. The Government urges that the Bureau of Prisons can provide for such surgery. It submits an affidavit from Newton E. Kendig, M.D., of the United States Public Health Service, assigned to the Federal Bureau of Prisons as the Assistant Director, Health Services Division and Medical Director of the Bureau of Prisons. Dr. Kendig states that organ transplant and related care for inmates in the custody of the Bureau of Prisons is available and that the Bureau will pay for such services and related care for inmates, if the Bureau finds that a transplant is appropriate. He further states that dialysis is available to inmates either in Bureau facilities or through private providers. He

advises that four Bureau facilities have the ability to administer dialysis treatment to inmates at those facilities.

Organ transplantation, however, is not available within such facilities and occurs in outside institutions such as the University of Massachusetts Memorial Medical Center. Dr. Kendig further states that "The BOP does not maintain or administer any organ transplant lists, and cannot place medically eligible inmates on the UNOS (United Network for Organ Sharing) list. Transplant centers, such as UMass Memorial Medical Center, have the authority to place candidates on the UNOS national transplant list and depend on UNOS to match available organs to compatible candidates."

If sentenced, the Bureau of Prisons, and not the Court, determines to which facility a prisoner will be assigned, and available space is one of the controlling criteria. Pursuant to my request for additional information, the U.S. Marshals Service advised the Probation Office that should the Court issue an order directing the Marshals Service to provide non-custodial travel based on Rausch's health issues, the Marshals Service would purchase an airline ticket for him to wherever he may be designated. This response was made, however, before he had part of his colon removed and a colostomy bag installed. There apparently is no provision for transportation with medical personnel accompaniment. This may be medically required due to emergencies and the extensive list of medications, including prescribed narcotics, that Rausch must take on a scheduled basis.

A number of problems presented by the Government's response are addressed by Rausch's counsel in her Combined Reply Brief To The Government's Sentencing Statement and The Government's Response Opposing Defendant's Motion For Below-Guideline Sentence.

Dr. Kendig's Declaration is just as interesting for what is *not* said as it is for what *is* said. What is *not* said is that the Bureau of Prisons has only one relationship with a transplant center — the University of Massachusetts Medical Center. Only the transplant center has the authority to place an inmate housed at [Federal Medical Center in Devens Massachusetts] on the UNOS transplant list. Mr. Rausch is already on the UNOS transplant list, but once imprisoned, he is passed over until the Medical Director approves and agrees to pay for the procedure. But first, Mr. Rausch must be approved for transplant "by clinical and professional staff" at a BOP institution. If approved by the BOP staff, he will be referred to the UMass Medical Center. The UMass Medical Center then must have access to Mr. Rausch through FMC Devens to determine whether he remains a good candidate. Only upon UMass approval, is the case submitted to the BOP Medical Director, who then, must also approve the referral and agree to pay for the procedure. (*emphasis in original*) (pps. 25-26)[4]

Rausch now has health insurance. It would not cover any medical expenses he would incur if imprisoned. Dr. Kendig's Declaration also points out that placement at FMC Devens is made if space is available and "there are no correctional or other issues precluding designation at FMC Devens." No evidence has been presented that Rausch could be housed in another Bureau of Prisons medical facility that would give him access to the transplant center in Massachusetts. The other looming issues include Rausch's being a former Bureau of Prisons employee, his mental deficits and his susceptibility to abuse, manipulation and perhaps assault by other prisoners. Following a complete evaluation by the University of Colorado Health Sciences Transplant Team, Rausch is already on the UNOS list. Given the foregoing, it is not predictable

---

[4] On August 8, 2008 the United States filed a response to Defendant's Combined Reply. Attached to it are two affidavits. One, from Jeffrey D. Allen, M.D., Chief of Health Programs for the Federal Bureau of Prisons, states that Rausch could be housed in one of four Medical Referral Centers equipped to provide dialysis for patients and confirms that FMC Devens is the one that can handle cadaveric and living donor organ transplants. Because Rausch has already been evaluated by the University of Colorado Transplant Team, Dr. Allen states, "[I]t is likely that the BOP's medical assessment will not take as long as in cases where the work-up is started *de novo* while in BOP custody.

that he would remain on the list if placed in the custody of the Bureau of Prisons or that he would be assigned to or remain at FMC Devens.

Finally, assuming that Rausch were sent to FMC Devens, remained there and received a transplant, he would be returned to the Bureau of Prison's custody. Stabilization post-transplant would be controlled by the Bureau and not by the UMass experts on the transplant team. If the Bureau decided to transfer Rausch to another facility, access to care by the doctors on the transplant team would be denied both by geographical necessity and bureaucratic fiat.

V.

The Need For the Sentence Imposed

A.      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Punishment is unpleasant and inflicted on an offender because he has committed an offense. It is not merely the inevitable consequence of a person's voluntary action, but rather the union of the individual's conduct with the recognition by society that its rules have been violated. Punishment is imposed by an agent authorized by the system, the rules of which have been violated. It is imperative that the agent act within the scope of the authority designated to him to reflect the societal mandate rather than personal preference or caprice.

The retributivist approach, advocated by the prosecution in this case stresses guilt and dessert, looking back to the crime to justify punishment and denying or ignoring that the consequences of punishment have any relevance to its justification. On the other side of the coin, the utilitarian approach taken by defense counsel insists that punishment is justified only if it has beneficent consequences that outweigh the intrinsic evil of inflicting suffering on another human being.

14

Lord Justice Denning, the great English jurist, has called punishment "the emphatic denunciation by the community of a crime." In his view, and I see great value in it, punishment reinforces the community's respect for its legal and moral standards. The restraint on this principle, however, is that punishment is only justifiable when it is deserved. Rausch has admitted guilt and the proof is evident and overwhelming. Even so, the utilitarian assertion is that every human being should be treated with at least a minimum of respect as a source of rights and expectations and not merely as an instrument for promotion of the social order.

While the practice of punishment has been extant throughout the history of human culture, so, too, has been its cautionary curtailment. As Judge Weinstein observed in *United States v. Gigante*, 989 F. Supp. 436, 422 (E.D.N.Y. 1998):

> [T]he principle of modifying a sentence to take account of a defendant's frailty has strong and ancient roots. *See, e.g., The Code of Maimonides,* Book XIV, The Book of Judges (Abraham M. Hershman, trans., Yale Univ. Press 1949 (emphasis omitted) ("How many stripes are inflicted . . . as it is said: to be beaten . . . according to the measure of his wickedness . . . (Deut.25:2). But the number is reduced in the case of a frail man . . . .").

In *The Letters of Abelard and Heloise*, 159 (Michael Clanchy ed., Betty Radice, trans., Penguin Classics 2004), one finds the following: "[F]or there is a well-known saying, 'The law was not made for the sick.'" (Letter from Abelard to Heloise discussing caring for the sick and giving them all that they require). Further, in Dostoyevsky's *The House of the Dead and Poor Folk*, 180 Constance Garnett, trans., (Barns and Noble Classics 2004), we read: "It is useless to punish a sick man." *Id.* (explaining the absurd practice of imprisoning sick men and making them wear shackles).[5]

---

[5] Recent post-Gall appellate decisions have upheld non-guideline sentences based on physical impairment. *See e.g.* United States v. McFarlin, ___F.3d ___, 2008 WL 2875830 (8th

Even when the U.S. Sentencing Guidelines were considered mandatory, downward departure was authorized under USSG Section 5H1.4 for "extraordinary physical impairment":

- *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (downward departure to 2 years probation warranted for defendant convicted of tax evasion because defendant was 69 years old and suffering from a combination of conditions including phlebitis, early stage chronic lymphocytic leukemia, colon polyps, hypercholesterolemia, and heart murmur. The opinion includes an excellent discussion of the principles behind the departure).

- *United States v. Jimenez*, 212 F. Supp. 2d 214, 216 (S.D.N.Y. 2002) (defendant convicted of illegally reentering U.S. after deportation received downward departure for extraordinary physical impairment because after the offense she suffered a brain aneurism that resulted in severe memory loss, loss of strength in her right arm, headaches, blurred vision and hallucinations).

- *United States v. Blarek*, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) (defendant convicted of conspiracy to commit racketeering and money laundering granted downward departure to three years of supervised release because of HIV-positive status).

- *United States v. Rioux*, 97 F.3d. 648 (2d Cir. 1996) (upholding downward departure based on physical condition and good works for a defendant convicted of violation of the travel act and scheme to commit extortion; defendant had received a

_____

Cir. July 28, 2008). *See also* United States v. Ruff, ___F.3d ___, 2008 WL 2940535 (9th Cir., August 1, 2008) where the Court observed "Gall happened to discuss post-crime maturation and self-rehabilitation because they were the basis of the district court's reasoned opinion in that case, but it is the reasoned decision itself, not the specific reasons that are cited, that triggers our duty to defer."

kidney transplant 20 years prior, and the new kidney was diseased requiring regular blood tests and medicines, and the defendant also received a double hip replacement requiring monitoring).

- *United States v. Long*, 977 F.2d 1264 (8th Cir. 1992) (upholding probation for defendant convicted of money laundering whose extraordinary physical impairment left him vulnerable to victimization in prison).

- *United States v. Baron*, 914 F. Supp. 660 (D. Mass 1995) (age and physical ailment of 76-year-old defendant, convicted of bank fraud, warranted downward departure to home detention and probation where defendant had cardiac condition and pituitary removed due to cancer, and was suspected of having prostate cancer).

Title 18 Section 3553(a) provides evaluative criteria to restore balance between the order of society emphasized by the retributivist approach and the utilitarian view that every human being must be treated with respect for his or her individual circumstances. The stated criteria may clash, and not all apply in each case. The criteria also point to individuated considerations: No one size fits all. The object of this balancing process is to achieve not a perfect or a mechanical sentence, but a condign one — one that is decent, appropriate and deserved under all attendant circumstances.

While convenient and time-saving, reducing this task to a mere ministerial one of mechanically applying the advisory sentencing guidelines is antithetical to the adjudicative process. Moreover, this case presents great difficulty in determining Rausch's culpability when he himself has such cognitive deficits that he cannot appreciate their depravity. While insanity is

not an issue in this case, diminished mental capacity is an attendant circumstance requiring

consideration.

B.      To afford adequate deterrence to criminal conduct

As ably pointed out by the Government in its sentencing memorandum, consumers of

child pornography fuel a demand for child abuse of the most damaging  kind.  The Declaration

of forensic pediatrician Sharon W. Cooper, M.D., appended to its sentencing memorandum,

provides powerful and convincing evidence of the devastating effects of child pornography upon

the children who have been exploited to produce this market.  She writes:

> Knowledge regarding victims of child pornography is growing.  As more
> children are rescued and evaluated, professionals in this field are
> recognizing that the baseline impact of child sexual abuse is worsened in
> many ways when pornographic memorialization has occurred.  These
> images of child abuse have a high association with guilt, self-blame and
> shame for children above the age of 4 -5 years. . . . Eating disorders such
> as bulimia, anorexia nervosa and obesity are well documented and for the
> latter diagnosis, increase a child's life-long risk for diabetes mellitus, heart
> disease and stroke.  A second complication of sexual victimization
> includes numerous mental health problems of which the three most
> common are Posttraumatic Stress Disorder (PTSD), Depression and
> Anxiety.
>
> * * * * * *
>
> It is clear that when a child has been lured, groomed or coerced into one or
> more sexual encounters with an adult, his or her life is changed and for a
> significant percentage of victims, this change leads all too often to out of
> home placement, transience, decline in school performance, higher risk for
> sexual behavior problems, substance abuse, mental health dysfunction,
> self-injurious and risk taking behaviors and when criminal justice
> outcomes occur, such female victims are 28 times more likely in their
> lives to be arrested for commercial sexual exploitation through
> prostitution.

There is no doubt child pornography exacerbates other kinds of child abuse, and its effects are ruinous to children throughout this country and throughout the world. There is no justification for it and deterrence and proscription are essential societal objectives.

C.      <u>To protect the public from further crimes of the defendant</u>

Rausch has no criminal history. There is no record of either juvenile or adult adjudications. He admits to having smoked marijuana at age 16, but denies ingesting any illicit drugs since that time. His present health is such that he is heavily medicated and his use of alcohol has rarely risen to the level of inebriation. Until recently, he has been gainfully employed and economically productive. Based on his mental evaluation, the risk of recidivism is very low, yet strong measures must be taken to insure that his use of child pornography is effectively terminated. There is no indication that he has personally participated in any form of violence except insofar as being a consumer of child pornography supports and encourages violence against its child victims.

D.      <u>To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.</u>

As previously stated, Rausch is unemployable and no further educational or vocational training is called for. His medical needs and care are considerable and being funded by his health insurance. Sentencing to the custody of the Bureau of Prisons is problematic in that his clearly required medical needs, including eligibility for a kidney transplant at government expense, are subject to nonmedical considerations. As stated by Dr. Humphreys, removing Rausch from the transplant list could prove indirectly fatal. So, too, suspension of eligibility pending Bureau of Prison processes and another evaluation could result in a lost opportunity for a transplant and interruption of his prescribed pain medications.

According to both Dr. Humphreys and Dr. Wells, Rausch must become involved in an intensive sex offender treatment program. Such counseling is all the more difficult due to his developing dementia and the organic effects of his hypertension, dialysis treatment and increasingly concrete thinking. Any sentence must take these factors into consideration.

## VI

## The Kinds of Sentences Available

As previously described, the maximum term of imprisonment for this offense is ten years. Sentencing according to the Sentencing Guidelines would be for 97 to 120 months. While a maximum fine of $250,000 is authorized and the guideline range would be from $17,000 to $125,000, it is uncontested that Rausch has no resources or income wherewith to pay any fine. Although restitution is not required because no financial loss has been incurred by anyone, the $100 special assessment fee is mandatory. Supervised release may be anywhere from five years to life. Rausch may be eligible, if imprisoned, for participation in the Bureau of Prisons residential sex offender treatment program if he were assigned to FMC Devens. This voluntary program takes from 12 to 18 months to complete and an inmate must have a maximum of 24 months and a minimum of 12 months remaining on his current sentence in order to qualify. If placed on probation, however, participation in a sex offender treatment program can be made mandatory and immediate.

Rather than imprisonment, probation for a maximum of five years may be imposed. As a special condition of probation or supervised release, Rausch can be restricted to his residence or a previously approved location. Home detention and home incarceration are to be used only as alternatives to imprisonment. Home detention requires a defendant to remain confined to his

home at all times except for permitted scheduled absences approved by the probation officer. The use of location monitoring devices may be required. Home incarceration is the most restrictive component of the location monitoring program and requires 24-hour-a-day lock down except for medical necessities and court appearances approved by the Court.

As an alternative to home detention, confinement in a residential reentry center (Halfway House) and placement in a Veteran's Administration facility or the Colorado State Veteran's Homes facilities were considered. Each, however, was unavailing. The residential reentry center would require Rausch to be separated from other inmates for his safety, but it has no facilities to accommodate that need. The Veteran's Administration nursing homes would require Rausch to qualify for long-term care, which means he would have to be incapable of caring for himself, dressing or bathing or cooking his own meals. The Colorado State Veteran's Homes do not accept veterans who need dialysis and/or would not accept Rausch due to the nature of his crime.

## VII

### A Condign Sentence

In considering all of the foregoing, I have decided to sentence Rausch to one day's incarceration, with credit for time served, with supervised parole subject to several conditions for the remainder of Rausch's life. Rausch must pay the mandatory special assessment fee of $100, but no fine will be imposed. The special conditions, in addition to those usually required of probationers, are that Rausch shall be in home confinement with electronic monitoring for as long as the Probation Office requires; register as a sex offender with local, state and national

authorities[6]; cooperate in providing DNA samples as directed by the Probation Office, and participate in whatever sex offender treatment programs the Probation Office may select for as long as the Probation Office requires.[7] Without further order, the Probation Office may direct Rausch to participate in other mental health counseling and treatment as it deems appropriate.

Rausch shall not be permitted to own or use a computer or in any way obtain connections with any internet server, and shall not possess, borrow, view or read any pornography, child or adult, in any manner. He shall not be permitted to use a telephone or other device for calls to or from any commercial vendor of sexually oriented conversation or service. It shall be the duty of the Probation Office to enforce these conditions by whatever methods it deems appropriate and Rausch shall provide written agreement and consent to these conditions and methods or probation will not be implemented. With the advance approval of the Probation Office, Rausch may be permitted to leave home confinement on a scheduled basis for purposes of receiving medical, psychological and spiritual treatment and counseling. He may attend church services and activities and obtain special advance permission to attend events such as weddings and

---

[6] To avoid any confusion, registration as a sex offender shall occur in any jurisdiction where Rausch resides, is employed, carries on a vocation, or is a student or patient, as directed by the Probation Office. In addition, the *Adam Walsh Child Protection and Safety Act* requires that Rausch register as a sex offender in City and County of Denver, Colorado if this jurisdiction differs from his jurisdiction of residence.

[7] Specifically, Rausch shall participate in an approved program of sex offender evaluation and treatment, which may include polygraph, plethysmograph and Abel examinations, as directed by the Probation Office. He will be required to pay the cost of these evaluations and treatment. He shall comply with the rules and restrictions specified by the treatment agency. The Probation Office is authorized to release medical, pharmaceutical, psychological, psychiatric and presentence reports and information to the treatment agencies for continuity of treatment.

funerals, such permission to be granted or withheld in the sole discretion of the Probation Office.

Any modification of these conditions may be obtained only upon order of the Court.

In sum, I am sentencing Rausch as shown based upon the following particular grounds:

First, this is a grievous offense which does not merit lenient treatment, and a one-day sentence

followed by life-time supervised parole with a period of home confinement is the strongest

penalty I can exact without putting Rausch's life at substantial risk.  Second, Rausch's extremely

poor health and the complexity of his needs for medical care override any value that further

imprisonment would have.  Third, given Rausch's frailty, his previous employment with the U.S.

Bureau of Prisons and the professional opinions of the psychiatric and psychological experts, his

vulnerability to victimization in prison is an unnecessary and unacceptably high risk.[8]  Fourth,

there is no discernible risk that Rausch has or will engage in sexual predatory behavior, and the

public can be protected by his home confinement   Finally, Rausch has been subject to home

confinement since December 13, 2007 without any negative reports and his medical needs have

been attended to under these conditions.  Should he fail, however, to abide by all the conditions

imposed on his supervised release, and his release is revoked, he should anticipate a maximum

---

[8]  Also attached to the United States' Response to Defendant's Combined Reply is an affidavit of Charles Nicklin, Assistant Administrator for the Correctional Services Branch of the Federal Bureau of Prisons attesting to the significant experience the Bureau of Prisons has in housing both former law enforcement officers and sex offenders and the precautions taken for their safety.  I have no doubt that the BOP takes every reasonable step it can to insure their safety and to prevent other prisoners from gaining access to prisoners' criminal histories.  Nevertheless, the plethora of prisoner cases I have presided over in the past thirty years, the volume of letters received from inmates and the legion of published studies on prison conditions establish clearly that violence against inmates, especially sex offenders, does occur and that vulnerable inmates are at greater risk of violence than typical inmate populations.  Combining Rausch's employment with the BOP and his deteriorating mental and physical conditions amply supports the expert psychiatric and psychological opinions that Rausch would be at high risk of being victimized.

sentence.  Rausch's motions for downward departure from guideline sentence and for probation

are denied as inconsistent with this sentence.

Dated this 12th day of August, 2008.

BY THE COURT:

**John L. Kane**
SENIOR U.S. DISTRICT JUDGE